**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

    **Plaintiff,**

         **v.**

JOSE LOPEZ-DIAZ [1],
CARLOS LOPEZ-DIAZ [2],

    **Defendants.**

**CRIMINAL NO.** 11-319 (FAB)

**OPINION AND ORDER**

BESOSA, District Judge.

Pending before the Court is defendant Jose Lopez Diaz's motion for a judgment of acquittal and for a new trial, (Docket No. 350), defendant Carlos Lopez Diaz's motion for a judgment of acquittal, (Docket No. 351), and defendant Carlos Lopez Diaz's motion for a new trial, (Docket No. 352). For the reasons discussed below, the Court **DENIES** both defendants' motion for a judgment of acquittal, **SUSTAINS** the jury verdict, and **DENIES** both defendants' motion for a new trial.

**BACKGROUND**

The Court will not rehash the entire trial here. Background information or facts will be recounted as needed in the Court's subsequent legal analysis of particular issues. See United States v. Stierhoff, 549 F.3d 19, 21 (1st Cir. 2008).

On December 21, 2011, a grand jury returned a Superseding Indictment against defendants Jose Lopez Diaz ("JLD"), Carlos Lopez

Diaz ("CLD"), and a number of other defendants.[1]  (Docket No. 138.)

The Superseding Indictment charged both defendants with thirty-five

counts of health care fraud, including one count of conspiracy, in

violation of 18 U.S.C. §§ 1349 and 1347; twenty-eight counts of

health care fraud in violation of 18 U.S.C. §§ 1347 and 2; and five

counts of aggravated identity theft in violation of 18 U.S.C.

§§ 1028A and 2.  Id.  The Superseding Indictment also contains a

forfeiture allegation pursuant to 18 U.S.C. § 982(a)(7), which

seeks forfeiture of any property constituting or derived as a

result of the health care fraud.  Id.

On May 14, 2012, a jury trial commenced as to defendants JLD

and CLD.  (Docket No. 267.)  At the close of the government's case,

on June 7, 2012, defendant CLD moved for acquittal on all counts

---

[1] On May 11, 2012, the government dismissed all pending counts
of the Superseding Indictment with regards to defendants Nicole
Lopez-Villamil, Ana Lopez-Villamil, Leslie Williams-Nieves and
Nahir Rodriguez-Candelario.  (Docket Nos. 261-264.)  At trial, the
government also dismissed count twenty of the Superseding
Indictment.  (Docket No. 404 at p. 78.)

pursuant to Federal Rule of Criminal Procedure 29[2] ("Rule 29").
(Docket No. 296.)   Following suit, defendant JLD also filed a
Rule 29 motion for a judgment of acquittal on June 8, 2012.
(Docket No. 297.)   The Court denied defendant JLD's motion and
reserved its judgment on defendant CLD's motion.   (Docket No. 397
at p. 68.)   At the close of the evidence in the jury trial,
defendants renewed their motions for acquittal.   (Docket No. 304.)
The Court denied defendant JLD's motion and reserved its judgment
on defendant CLD's motion.   Id.

On June 14, 2012, a jury found defendants JLD and CLD guilty
of the following offenses:   (1) one count of conspiracy to commit
health care fraud and (2) five counts of aggravated identity theft.
(Docket Nos. 310 & 311.)   The jury also found defendant JLD guilty
on twenty-eight counts of health care fraud.   (Docket No. 310.)   On

_____

[2] Fed.R.Crim.P. 29 states, in pertinent part:   "(a) Before
Submission to the Jury. After the government closes its evidence or
after the close of all the evidence, the court on the defendant's
motion must enter a judgment of acquittal of any offense for which
the evidence is insufficient to sustain a conviction . . . .
(b) Reserving Decision.   The court may reserve decision on the
motion, proceed with the trial (where the motion is made before the
close of all the evidence), submit the case to the jury, and decide
the motion either before the jury returns a verdict or after it
returns a verdict of guilty or is discharged without having
returned a verdict.   If the court reserves decision, it must decide
the motion on the basis of the evidence at the time the ruling was
reserved.   (c) After Jury Verdict or Discharge.   (1) Time for a
Motion.   A defendant may move for a judgment of acquittal, or renew
such a motion, within 14 days after a guilty verdict or after the
court discharges the jury, whichever is later.   (2) Ruling on the
Motion.   If the jury has returned a guilty verdict, the court may
set aside the verdict and enter an acquittal . . . ."

July 17, 2012, defendant JLD moved for judgment of acquittal and/or
a new trial pursuant to Rule 29 and Federal Rule of Criminal
Procedure 33[3] ("Rule 33").  (Docket No. 350.)  On July 18, 2012,
defendant CLD also renewed his motion for judgment of acquittal
pursuant to Rule 29.   (Docket No. 351.)   On that same date,
defendant CLD moved for a new trial pursuant to Rule 33.  (Docket
No. 352.)  On September 4, 2012, the government filed a response to
defendants' motions.   (Docket No. 361.)   Defendant CLD filed a
reply to the government's response on September 19, 2012.  (Docket
No. 380.)  Defendant JLD filed a reply to the government's response
on September 20, 2012.  (Docket No. 381.)

## DISCUSSION

### I.   Legal Standard for Motion for Judgment of Acquittal

A court may enter a judgment of acquittal of any offense for
which the evidence is insufficient to sustain a conviction.
Fed.R.Crim.P. 29(a).  A defendant may move the court for a judgment
of acquittal after the close of the government's case or at the
close of all the evidence.   Id.  Courts may reserve their decision
on the motion, submit the case to the jury, and decide the motion

---

[3] Fed.R.Crim.P. 33 states, in pertinent part: "(a) Defendant's
Motion.  Upon the defendant's motion, the court may vacate any
judgment and grant a new trial if the interest of justice so
requires . . . . (b) Time to File.  (1) Newly Discovered Evidence.
Any motion for a new trial grounded on newly discovered evidence
must be filed within 3 years after the verdict . . . .(2) Other
Grounds.  Any motion for a new trial grounded on any reason other
than newly discovered evidence must be filed within 14 days after
the verdict or finding of guilty."

before or after the jury returns a verdict of guilty.
Fed.R.Crim.P. 29(b).  A defendant may also move for judgment of
acquittal within fourteen days after a guilty verdict or after the
discharge of the jury, whichever is later.  Fed.R.Crim.P. 29(c)(1).
Both defendants JLD and CLD have timely filed their motions for
acquittal.

In reviewing a Rule 29 motion for judgment of acquittal, a
district court must consider the evidence, both direct and
circumstantial, "in the light most favorable to the prosecution" to
determine whether the "body of proof, as a whole, has sufficient
bite to ground a reasoned conclusion that the government proved
each of the elements of the charged crime beyond a reasonable
doubt."  United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999)
(citations omitted).  This standard requires the resolution of all
evidentiary disputes and credibility questions in favor of the
government; the Court must also draw all reasonable inferences in
favor of the government's case.  United States v. Savarese, 686
F.3d 1, 8 (1st Cir. 2012).  Thus, the jury's verdict stands unless
the evidence could not have persuaded a rational trier of fact of
the defendant's guilt beyond a reasonable doubt.  United States v.
Soler, 275 F.3d 146, 150 (1st Cir. 2002) (citing Lara, 181 F.3d
at 200).  The Court assesses only the admissible evidence at trial
in applying the sufficiency standard.  United States v. Aviles-
Colon, 536 F.3d 1, 13–14 (1st Cir. 2008)

**II.  Legal Standard for Motion for A New Trial**

A trial court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a).  A defendant may base his motion for a new trial on newly discovered evidence or on other grounds.  Fed.R.Crim.P. 33(b).  But, "[t]he remedy of a new trial must be used sparingly and only where a miscarriage of justice would otherwise result." United States v. Del-Valle, 566 F.3d 31, 38 (1st Cir. 2009)(internal citation and quotation marks omitted); United States v. Garcia-Alvarez, 541 F.3d 8, 16-17 (1st Cir. 2008); see also United States v. Rodriguez-De Jesus, 202 F.3d 482, 486 (1st Cir. 2000) (quoting United States v. Gonzalez-Gonzalez, 136 F.3d 5, 12 (1st Cir. 1998) (stating that the remedy of a new trial is used rarely and "only where there would be a miscarriage of justice or where the evidence preponderates heavily against the verdict").  For Rule 33 motions, the district court may weigh the evidence and consider the credibility of the witnesses. United States v. Merlino, 592 F.3d 22, 32 (1st Cir.), cert. denied, __ U.S. __, 131 S.Ct. 283 (2010) (internal citations omitted).  If a district court grants a motion for a new trial based on the weight of evidence "rather than [on] its concern about the effect of prejudicial acts that may have resulted in an unfair trial, . . ." it has to be "quite clear that the jury has reached a seriously erroneous result." Id. (internal citations and quotation marks omitted.)  Generally, a district court should defer

to a jury's credibility assessments; only in "exceptional circumstances" may a trial judge "intrude upon the jury function of credibility assessment." Id. at pp. 32-33.

"Motions for a new trial are directed to the discretion of the trial court." United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980); see also Merlino, 592 F.3d at 32. It is for that reason that the First Circuit Court of Appeals has stated that it reviews a denial of a Rule 33 motion for "manifest abuse of discretion." United States v. Valerio, 676 F.3d 237, 246 (1st Cir. 2012) (internal citation omitted).

## III. Analysis

Defendant JLD requests that the Court enter a judgment of acquittal with regard to his convictions of all of the charges in the Superseding Indictment.[4] (Docket No. 350 at p. 1.) Defendant CLD also alleges that his convictions under count one and counts thirty-one to thirty-five of the Superseding Indictment cannot stand. (Docket No. 351 at p. 1.) In the alternative, defendants seek a new trial pursuant to Rule 33 by advancing the same

---

[4] Except count twenty which was dismissed by the government prior to trial.

arguments.[5]  (See Docket Nos. 350 & 352.)  The Court will address

both motions in this opinion.

The Court will first address defendant JLD's motions regarding

the health care fraud charges in counts two through nineteen and

twenty-one to twenty-nine of the Superseding Indictment because

some of the background information regarding medical terms and

definitions is pertinent to the other charges.  Next, the Court

will address both defendants' motions regarding the conspiracy

charge in count one of the Superseding Indictment.  Finally, the

Court will address both defendants' motions regarding the

aggravated identity theft and aiding and abetting charges in counts

thirty-one to thirty-five of the Superseding Indictment.

**A.    Health Care Fraud Charges**

Counts two through nineteen and twenty-one to twenty-nine

of the Superseding Indictment charge defendant JLD with Medicare[6]

---

[5] Defendant JLD's motion for a new trial relies on the same
exact arguments for a motion for judgment of acquittal.  (See
Docket No. 350.)  Defendant CLD's motion for a new trial also
repeats the same arguments in his motion for a judgment of
acquittal:  he incorporates all of his arguments from his Rule 29
motion into his Rule 33 motion.  (See Docket No. 352.)

[6] Medicare is a federal health insurance program for people
who are sixty-five years of age or older, or who have end-stage
renal disease.  (Docket No. 404 at pp. 119-120.)

fraud pursuant to 18 U.S.C. § 1347.[7]  (Docket No. 138.)  The
Superseding Indictment charges that defendant JLD knowingly
submitted and caused to be submitted to Medicare, through a variety
of carriers, false and fraudulent claims for medical surgeries,
including "the complicated drainage of perineal urinary
extravasation procedure, emergency room department visits and
critical care evaluation and management of Medicare beneficiaries
for pay and profit."  Id. at p. 8.

          To establish that defendant JLD committed Medicare fraud,
the government must establish that defendant JLD (1) knowingly and
willfully executed, or attempted to execute, (2) a scheme or
artifice to defraud any health care benefit program; or to obtain
any money or property owned by or under the custody or control of
any health care benefit program by means of false or fraudulent
pretenses.  18 U.S.C. § 1347(a).  Furthermore, the scheme must
(3) be in connection with the delivery of or payment for health
care benefits, items, or services.  Id.

---

          [7] 18 U.S.C. § 1347 provides in relevant part that:
"(a)[w]hoever knowingly and willfully executes, or attempts to
execute, a scheme or artifice – (1) to defraud any health care
benefit program; or (2) to obtain, by means of false or fraudulent
pretenses, representations, or promises, any of the money or
property owned by, or under the custody or control of, any health
care benefit program, in connection with the delivery of or payment
for health care benefits, items, or services, shall be fined under
this title or imprisoned not more than 10 years, or both. . . .(b)
With respect to violations of this section, a person need not have
actual knowledge of this section or specific intent to commit a
violation of this section.

Defendant JLD contends that there is no evidence that he intended to collect from Medicare. (Docket No. 350 at pp. 6-7.) With regards to counts four to nine, and twenty-three to thirty,[8] he states that there is no evidence that he billed Medicare. Defendant JLD argues that, according to the evidence, he submitted bills to privately-owned insurance companies, which pay from private funds and not from Medicare funds. Id. at p. 7. Furthermore, he argues that the government failed to show that defendant JLD or anyone related to defendant CLD's mobile dental clinic had knowledge that the beneficiaries mentioned in counts two, three, ten to nineteen, twenty-one, and twenty-two[9] were dead at the time he allegedly provided services to them. Id. at p. 6. Finally, defendant JLD argues that the government failed to prove that he was the "Jose Lopez" who submitted the billing claim forms, because there are many people named Jose Lopez, and that those

_____

[8] All of these counts charge defendant JLD with executing a scheme to defraud by causing false and fraudulent claims to be submitted to Medicare for beneficiaries who were alive at the time of the alleged service. (See Docket No. 138 at pp. 11 & 16.)

[9] These counts charge defendant JLD with executing a scheme to defraud by causing false and fraudulent claims to be submitted to Medicare for beneficiaries who were deceased at the time of service. (See Docket No. 138 at pp. 11 & 15.)

claim forms affected interstate commerce.[10]  Id. at p. 8.  The Court

finds  defendant  JLD's  contentions  unavailing  and  addresses

defendant JLD's arguments in turn.

_____

[10] The  Court  declines  to  address  the  interstate  commerce
argument.  Defendant JLD argues in a cursory manner that "[t]he
affect on interstate commerce is an essential element of the crime
and must be establish [sic] beyond a reasonable doubt and no such
evidence exists."  (Docket No. 350 at p. 8.)  Defendant JLD
provides no related authority, however, to support this contention.
"It is the duty of an attorney to research the law and to present
the court with citations to controlling legal authority . . . ."
Vargas v. McNamara, 608 F.2d 15, 19 (1st Cir. 1979); see also
Rodriguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir.
2011)("Judges are not mind-readers, so parties must spell out their
issues clearly, highlighting the relevant facts and analyzing on-
point authority.")  Failure to support the argument constitutes a
waiver.  Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 58 (1st
Cir. 2013) (citing United States v. Zanino, 895 F.2d 1, 17 (1st
Cir. 1990) (". . . issues adverted to in a perfunctory manner,
unaccompanied by some effort at developed argumentation, are deemed
waived.")

### i.  Charges Relating to Patients Who Were Alive

Contrary to defendant JLD's argument that there is no evidence that he intended to collect from Medicare with regards to counts four to nine, and twenty-three to thirty, (Docket No. 350 at pp. 6-7), the government introduced a variety of evidence at trial to show that defendant JLD caused false and fraudulent claims to be submitted to Medicare for the beneficiaries in those counts. Not only has the government introduced the actual billing claim forms for each count, it also introduced testimony from witnesses that would allow a reasonable jury to conclude beyond a reasonable doubt that the forms show how defendant JLD billed for procedures that did not occur.

Defendant JLD argues that he only submitted bills "to privately owned insurance companies, which pay from private funds and not from Medicare funds." (Docket No. 350 at p. 7.)  The government's evidence of over 1,700 "CMS 1500 claims forms,"[11] however, show that defendant JLD submitted billing claims to

_____

[11] CMS is the acronym commonly used to refer to the Center for Medicare and Medicaid Services.  (Docket No. 404 at pp. 119-120.) CMS administers Medicaid and Medicare: it pays for medical services to Medicare beneficiaries.  Id.  The 1500 form is a health insurance claim form for all Medicare billing, for "fee for service and for most of the managed care types of services."  (Docket No. 404 at pp. 145-46.)  Medicare providers, including physicians, submit a CMS 1500 form ("1500 form") after they have seen a patient and delivered a service.  (Docket No. 404 at pp. 145-46; See Exh. 2.)  The provider's signature on the form indicates that everything on the form is true and correct, and that the services took place. (Docket No. 408 at p. 61.)

Medicare Advantage Plans.  A Medicare Advantage Plan ("MAP") is a type of Medicare health plan offered by a private company that contracts with Medicare to provide beneficiaries with Medicare benefits.  (Docket No. 404 at p. 134; Docket No. 405 at p. 85.) Beneficiaries who participate in these plans still benefit from Medicare via Part C of the Medicare program.  Id.

          Fourteen of the claims forms[12] indicate that defendant JLD made claims to Medicare y Mucho Mas ("MMM"), a MAP, for alleged services that were provided to the beneficiaries listed in counts four to nine and twenty-three to thirty.  (See Docket No. 408 at pp. 52-53 & 61; Exh. 16 & 31.)  Olgamarien Castillo-Aguiar ("Castillo"), who has been a data analyst for MMM for "fraud, losses, and abuses" since 2008, testified for the government.  (Docket No. 408 at pp. 41-42.)  She stated that MMM is a MAP and that all of MMM's patients are covered by Medicare, (Docket No. 408 at pp. 41-42), which directly counters defendant JLD's argument that he had no intent to collect from Medicare because "none of the Medicare boxes are checked off in line one of the 1500 forms, Medicare will not be paid," (Docket No. 350 at p. 6).  Contrary to defendant JLD's assertions that "in order to

_____

[12] These fourteen claim forms are only a small portion of the 1,700 claim forms that the government submitted throughout the course of the trial to show that defendant JLD submitted billing claims to MMM and other MAPs, including Triple S, Medical Card System, and American Health Medicare.  (See Docket No. 408 at pp. 52-53 & 61.)

bill Medicare, the provider must have a contract with Medicare,"
id., Castillo stated that even though defendant JLD has no contract
with MMM, he can still bill MMM under one of the exceptions that
Medicare allows for non-contracted providers, (Docket No. 408 at
p. 74).  Castillo confirmed that non-contracted providers can
receive payment if the provider performs emergency services or
performs the procedures in an emergency room.  Id. at p. 49.

Each of the fourteen claims forms support the
charges in counts four to nine and twenty-three to thirty.  (Exh.
2, 16, & 31.)  The forms were all submitted to MMM and they
contained the same claim numbers, CPT codes,[13] amounts billed, and
dates billed as the ones listed in the respective counts.  Id.
Contrary to defendant JLD's contention that the government failed
to prove that he was the Jose Lopez who submitted the claims forms,
(Docket No. 350 at p. 7), the forms also contain defendant JLD's
information in Item 33, which requests the billing provider
information and phone number.  Id.  Furthermore, item 32a of all of

---

[13] CPT stands for "Common Procedural Terminology," and CPT
codes are unique identifiers that correspond to specific medical
procedures.  (See Docket No. 405 at p. 6.)  CMS uses these codes to
determine what the provider did for the patients so that it may
process and pay for the services appropriately.  Id.  CMS pays on
a fee schedule based on the service that the provider gave to the
patients.  Id.  For example, CPT Code 25505 is the identifier for
"closed treatment of radial shaft fracture with manipulation"; CPT
code 53085 is the identifier "drainage of perineal urinary
extravasation, complicated"; and CPT Code 99285 is the identifier
for "evaluation and management" during an emergency department
visit.  (Docket No. 405 at pp. 21-23; see also Exh. 4a at pp. 89 &
190.)

the forms list defendant JLD's unique National Provider Information number ("NPI"), which allows CMS to determine the identity of the provider. (See Docket No. 408 at p. 67; Exh. 16 & 31.)

The government also provided testimony to support that these patients did not receive the services listed in the claims forms. For example, count six of the Superseding Indictment charges defendant JLD with causing a false and fraudulent claim to be submitted to Medicare for a beneficiary with the initials "P.O." (Docket No. 138 at p. 11.) The MMM Claim number listed in the Superseding Indictment is "351011," the services listed were CPT Codes 53085 and 99285, the amount charged was $1,000.00, and the date billed was December 16, 2009. Id. Edgardo Garcia ("Garcia"), the manager of the Christian Elderly Home, testified that one of the beneficiaries listed on one of the claims forms,[14] Pablo Ortiz ("Ortiz"), is a resident of the home. (Docket No. 392 at p. 9; Exh. 16.) The form indicates that defendant JLD performed a drainage of Ortiz's perineal area[15] – around his legs – on December 3, 2009. (Exh. 16.) Garcia indicated that Ortiz did not receive this service on December 3, 2009, and that he has never been treated by defendant JLD. (Docket No. 392 at p. 10.)

---

[14] The claims form contains MMM Claim Number "351011 Dec 16 '09" on the top right hand side and the rest of the information on the form matches the information listed in count six of the indictment.

[15] This is the second procedure listed on the form; it is listed as CPT Code 50385. (Exh. 16.)

Furthermore, Garcia stated that Ortiz cannot sign any form because he is an Alzheimer's patient who is not competent; instead, his family members have to sign for him. (See Docket No. 392 at pp. 8 & 10.)  The government also produced evidence that between November 28, 2009 and December 7, 2009, which includes the alleged dates of service for these fourteen claim forms, defendant JLD's Automated Teller Machine ("ATM") card was used for purchases in Mexico. (Docket No. 393 at pp. 153-154.)  The bank that issued the ATM card did not receive any kind of complaint from defendant JLD that the card was stolen or that the purchases were fraudulent. Id. at pp. 156-57.  The inference is that defendant JLD was in Mexico at the time he claimed he performed the procedure on Mr. Ortiz.

Other testimony provided by Castillo also supports that the patients did not receive the services listed in the claims forms that were submitted by defendant JLD to MMM.  Castillo indicated that defendant JLD was an "outlier" among other providers because of the amount he billed for – over $1.7 million – and because of how many times he billed for certain procedures. (Docket No. 408 at p. 50.)  For CPT code 53085, "the drainage of the perineal urinary extravastion, complicated," defendant JLD was the number one biller and "in reality, the only [provider, including urologists]" who billed MMM for the procedure. Id. at p. 56.  This surgical procedure is performed on the urinary system, and it is a code that is mainly used by urologists, who are

specialists that perform this procedure. General practitioners like JLD may not perform the procedure. (Docket No. 405 at pp. 143-144; Docket No. 407 at p. 89.) Even urologists rarely bill for this procedure: no other provider, including urologists, billed MMM for performing a procedure under CPT Code 53085. (Docket No. 405 at p. 135; Docket No. 408 at p. 56.)

Castillo also indicated that more than fifty percent of the claims that defendant JLD submitted for this particular code were for patients who were women. (Docket No. 408 at p. 57.) The claims form for "H.N." in count twenty-six indicates that "H.N." is a female and that defendant JLD billed for performing this procedure on her. (See Exh. 31.) Yet, at least two witnesses – Jean Stone, a CMS employee, and Ted Grisell ("Grisell"), an expert in abdominal surgery – testified that the procedure can only be performed on males because it is a drainage that goes through the scrotum, which is a body part that females do not have. (Docket No. 406 at p. 22; Docket No. 407 at pp. 85 & 89.) Thus, Grisell indicated that it would not be "anatomically feasible" to perform this procedure on females. (Docket No. 407 at p. 91.)

All of this evidence, therefore, is sufficient for a reasonable jury to find that defendant JLD caused false and fraudulent claims to be submitted to Medicare for the beneficiaries in counts four to nine and twenty-three to thirty of the Superseding Indictment.

### ii.  Charges Relating to Deceased Patients

The government also introduced a variety of evidence to show that defendant JLD caused false and fraudulent claims to be submitted to Medicare for beneficiaries who were deceased at the time of the alleged service.  It offered evidence from the CMS, death certificates, and billing forms to show that defendant JLD submitted claims for services that were allegedly provided to a number of beneficiaries after their deaths.

The government's first witness, Stone, works for CMS in the Center for Program Integrity.  (Docket No. 404 at pp. 118-120.)  She stated that CMS pays for medical services to Medicare beneficiaries.  <u>Id.</u>  Stone testified that CMS has a central database, which contains the name of anyone who is enrolled in a MAP; the database also contains the beneficiaries' eligibility information.  (Docket No. 404 at pp. 132-133; Docket No. 405 at p. 58.)  Stone testified that the database indicates that a number of defendant JLD's patients – specifically, the ones listed by their initials in counts two, three, ten through nineteen, twenty-one, and twenty-two – are deceased.  (Docket No. 138 at pp. 11 & 15; Docket No. 405 at pp. 61-68.)  Furthermore, Alejita Santos ("Santos"), who works for the demographic registry of the Puerto Rico Department of Health, confirmed Stone's testimony.  (<u>See</u> Docket No. 406 at pp. 36-45.)  Santos has been working for the demographic registry for eighteen years and has been supervising

staff in "the investigation area" for five years. (Docket No. 406 at p. 36.) The demographic registry, she testified, "is the custodian of all vital elements: death, birth, and marriages." Id. Thus, one of the registry's duties is to keep custody of death certificates. Id. at p. 37.

Santos testified that the government's Exhibit 8 contained thirteen death certificates prepared by the demographic registry. Id. at pp. 38-40. Her testimony also supports Stone's testimony about the same thirteen beneficiaries who were listed as deceased in CMS' system. Amador Marin ("Marin"), who is a fraud examiner for a MAP called American Health Medicare ("AHM"),[16] also testified for the government. (Docket No. 407 at p. 9.) Marin stated that the dates of death and the social security numbers listed in the CMS database and on the death certificates are identical for each of the thirteen beneficiaries. Id. at pp. 23-45. She also confirmed that defendant JLD submitted health insurance claim forms for services allegedly rendered to each and every one of those thirteen beneficiaries after their death. Id. At least seven of those claims show that the services were allegedly rendered more than one year after the beneficiaries' death. Id.

---

[16] AHM manages the medical services of the Medicare beneficiaries who have chosen it as their plan. (Docket No. 407 at p. 9.)

Altogether, the testimony of Stone, Santos, and Marin reveal the following about the thirteen beneficiaries: Isidoro Santiago, listed in count two of the Superseding Indictment as "I.S.", died on April 24, 2008 at ninety years of age. (Docket No. 138 at p. 11; Docket No. 406 at p. 39; Exh. 8A.) Defendant JLD submitted a claim form for services rendered to Isidoro Santiago on May 23, 2009. (Docket No. 407 at p. 23; Exh. 11.) Catalina Figueroa, listed in count three of the Superseding Indictment as "C.F.", died on July 3, 2008 at eighty-nine years of age. (Docket No. 138 at p. 11; Docket No. 406 at p. 41; Exh. 8B.) Defendant JLD submitted a claim form for services rendered to Catalina Figueroa on September 4, 2008. (Docket No. 407 at p. 25; Exh. 11.) Maria Bonano, listed in counts ten and twenty-one of the Superseding Indictment as "M.B.", died on July 2, 2008 at sixty years of age. (Docket No. 138 at p. 15; Docket No. 406 at p. 42; Exh. 8C.) Defendant JLD submitted a claim forms for services rendered to Maria Bonano on July 10, 2008 and for August 4, 2009. (Docket No. 407 at pp. 27-28; Exh. 11.) Eugenio Gotay, listed in count eleven of the Superseding Indictment as "E.G.", died on March 23, 2008 at sixty years of age. (Docket No. 138 at p. 15; Docket No. 406 at p. 42; Exh. 8D.) Defendant JLD submitted a claim form for services rendered to Eugenio Gotay on August 13, 2008. (Docket No. 407 at p. 29; Exh. 11.) Amparo Ocasio, listed in count twelve of the Superseding Indictment as "A.O.", died on June 24, 2008 at ninety-

five years of age. (Docket No. 138 at p. 15; Docket No. 406 at
p. 42; Exh. 8E.) Defendant JLD submitted a claim form for services
rendered to Amparo Ocasio on August 17, 2008. (Docket No. 407 at
pp. 30-31; Exh. 11.) Maria Leoteau, listed in count thirteen of
the Superseding Indictment as "M.L.", died on July 31, 2008 at
ninety-four years of age. (Docket No. 138 at p. 15; Docket No. 406
at p. 42; Exh. 8F.) Defendant JLD submitted a claim form for
services rendered to Maria Leoteau on August 18, 2008. (Docket
No. 407 at pp. 32-33; Exh. 11.) Juan Rivera, listed in count
fourteen of the Superseding Indictment as "J.R.", died on March 26,
2008 at sixty-eight years of age. (Docket No. 138 at p. 15; Docket
No. 406 at p. 43; Exh. 8G.) Defendant JLD submitted a claim form
for services rendered to Juan Rivera on September 2, 2008. (Docket
No. 407 at p. 35.) Amelia Gaud, listed in count fifteen of the
Superseding Indictment as "A.G.", died on June 4, 2008 at ninety-
two years of age. (Docket No. 138 at p. 15; Docket No. 406 at
p. 43; Exh. 8H.) Defendant JLD submitted a claim form for services
rendered to Amelia Gaud on September 2, 2008 (Docket No. 407 at
p. 36; Exh. 11.) Victor Segarra, listed in count sixteen of the
Superseding Indictment as "V.S.", died on June 2, 2007 at seventy-
five years of age. (Docket No. 138 at p. 15; Docket No. 406 at
p. 44; Exh. 8I.) Defendant JLD submitted a claim form for services
rendered to Victor Segarra on December 5, 2008. (Docket No. 407 at
p. 38; Exh. 11.) Wigberto del Valle, listed in count seventeen of

the Superseding Indictment as "W.D.V.", died on October 5, 2007 at sixty-seven years of age. (Docket No. 138 at p. 15; Docket No. 406 at p. 44; Exh. 8J.) Defendant JLD submitted a claim form for services rendered to Wigberto del Valle on December 5, 2008. (Docket No. 407 at p. 39; Exh. 11.) Pedro Delgado, listed in count eighteen of the Superseding Indictment as "P.D.", died on June 27, 2007 at eighty years of age. (Docket No. 138 at p. 15; Docket No. 406 at pp. 44-45; Exh. 8K.) Defendant JLD submitted a claim form for services rendered to Pedro Delgado on December 6, 2008. (Docket No. 407 at p. 41; Exh. 11.) Julia Acevedo, listed in count nineteen of the Superseding Indictment as "J.A.", died on October 12, 2007 at seventy-four years of age. (Docket No. 138 at p. 15; Docket No. 406 at p. 45; Exh. 8L.) Defendant JLD submitted a claim form for services rendered to Julia Acevedo on December 7, 2008. (Docket No. 407 at p. 42; Exh. 11.) Cecilia Correa, listed in count twenty-two of the Superseding Indictment as "C.C.", died on May 8, 2007 at ninety-two years of age. (Docket No. 138 at p. 15; Docket No. 406 at p. 44; Exh. 8M.) Defendant JLD submitted a claim form for services rendered to Cecilia Correa on April 7, 2010. (Docket No. 407 at p. 44; Exh. 11.)

        All of this evidence is sufficient for a reasonable jury to find beyond a reasonable doubt that defendant JLD is guilty of health care fraud. At a minimum, a reasonable juror can find that defendant JLD "attempted to execute a scheme or artifice to

defraud" Medicare by submitting claims to MMM, which is a MAP, for services that were not rendered.  Given that the claims billed for services that never occurred on many beneficiaries – some who are alive and some who are deceased, a reasonable juror can find beyond a reasonable doubt that defendant JLD attempted to obtain money from Medicare and that he did so via false or fraudulent pretenses. Furthermore, the government introduced testimony and evidence from several other MAPs, including companies like Triple S and AHM, to show that defendant JLD engaged in a scheme of health care fraud by billing for claims that never occurred.  All of the MAPs representatives indicated that they investigated defendant JLD for fraud, and all of them arrived at the conclusion that he was not providing services for which he billed, and that they all suspended payments to him.  The Court, therefore, finds defendant JLD's arguments regarding his health care fraud convictions unavailing. Accordingly, the Court **DENIES** defendant JLD's motion pursuant to Rule 29.

The Court also **DENIES** defendant JLD's Rule 33 motion regarding the health care fraud charges.  Defendant JLD has not indicated that there is any new evidence that warrants review by the Court and he does not allege that the credibility of witnesses is in question.  (See Docket No. 350.)  The Court also finds no problems with either issue.  Finally, the testimony and physical evidence, mainly the claim forms, do not preponderate heavily

against the verdict.  Rodriguez-De Jesus, 202 F.3d at 486 (quoting

Gonzalez-Gonzalez, 136 F.3d at 12 (stating that the remedy of a new

trial is used rarely and "only where there would be a miscarriage

of justice or where the evidence preponderates heavily against the

verdict")).  Therefore, the Court **DENIES** defendant JLD's Rule 33

motion regarding the health care fraud charges.

###    B.    Conspiracy to Commit Health Care Fraud

Count one of the Superseding Indictment charges defendant

JLD and defendant CLD of conspiring to commit the federal crime of

health care fraud pursuant to 18 U.S.C. §§ 1347 and 1349.[17]  (Docket

No. 3.)    The First Circuit Court of Appeals has defined a

conspiracy as "an agreement between the defendant and another or

others" with the particular object to commit a crime.  United

States v. Tum, 707 F.3d 68, 74 (1st Cir. 2013) (internal citation

omitted).  Each defendant must be a "willing participant" but he or

she does not need to have knowledge of "the exact scope and extent

of the collective endeavor."  Id. (internal citation omitted).

Therefore, it is sufficient for a defendant to have knowledge of

the "essential nature" of the plan.  Id. (internal citation

omitted); see also United States v. Newell, 658 F.3d 1, 14 (1st

Cir. 2011) (stating that a formal agreement is not required for a

---

[17] 18 U.S.C. § 1349 provides that "[a]ny person who attempts
or conspires to commit any offense under this chapter shall be
subject to the same penalties as those prescribed for the offense,
the commission of which was the object of the attempt or
conspiracy."  18 U.S.C. § 1349.

conspiracy to exist, and that an agreement can be shown by "the parties working together understandingly, with a single design for the accomplishment of a common purpose")(internal quotation marks and citations omitted).

Defendant JLD, defendant CLD and the government agree that to establish a health care fraud conspiracy, the United States must prove that:  (1) an agreement specified in the indictment existed between at least two people to commit health care fraud; (2) that the defendants willfully joined in the agreement; and (3) that one of the conspirators committed an overt act during the period of the conspiracy in an effort to further the purpose of the conspiracy.  (Docket No. 350 at p. 14; Docket No. 351 at pp. 10-11; Docket No. 361 at pp. 41-42.)

The Court finds the defendants' arguments unavailing and agrees with the government that there is sufficient evidence for a jury to find that defendants JLD and CLD had an agreement, in which defendant CLD willfully and voluntarily agreed to give the names of his patients to defendant JLD to use on his claim forms even though defendant JLD had not, in fact, attended to any of the patients. The Court first reviews the evidence presented at trial and then addresses the defendants' arguments in turn.

### i.   Evidence Relating to the Conspiracy Charge

The government produced testimony from former employees of defendants JLD and CLD to support its conspiracy

charge:  Marilyn Perez ("Perez"), Nahir Rodriguez ("Rodriguez"),
Leslie Williams ("Williams"), and Joel Figueroa ("Figueroa").

### a.    Perez's Testimony

Perez testified that she worked for defendant
CLD from January 2011 until September 2011.  (Docket No. 392 at
p. 74.)  Her job required that she coordinate the mobile dental
clinic visits to different places like schools, centers for the
elderly, and private companies.  Id.  She testified that, after
obtaining information from the schools and other locations, she
prepared a record for each location with all of the patients'
information and gave them to defendant CLD.  Id. at p. 80.  She
indicated that the patient files contained, among other
information, personal information like the patients' social
security numbers, their health plans, and their medical histories.
Id. at pp. 85-86.  Her duties also required her to ensure that the
patients had insurance and that they were eligible for treatment.
Id. at p. 100.

When Perez starting working at the clinic, she
was told that the clinic needed to have a consulting physician on
call in case there were any complications with patients or if
someone had to deal with anesthesia.  (Docket No. 392 at p. 97.)
She also indicated that defendant JLD was this "on-call physician."
Id.  Perez stated, however, that she never saw defendant JLD
working inside the mobile dental clinic during the entire time of

her employment with defendant CLD.  Id. at p. 127.  She also
indicated that defendant JLD was never called upon for any
consultation.  Id.  She observed defendant JLD, however, going into
defendant CLD's home and "work[ing] on" the files of defendant
CLD's patients.  Id. at pp. 85, 110, & 112.  She recognized the
files because she prepared them.  Id. at p. 84.  She testified that
defendant JLD has asked her about the files.  Id.  For example, she
indicated that he asked her about the records for *Hogar Carreño*,
which she identified as one of the homes that defendant CLD visited
to perform dental work on the residents.  Id.  Perez stated that
she did not know what defendant JLD did with the files.  Id. at
p. 85.  She indicated that she observed defendant JLD asking
defendant CLD about the location of the records for various schools
and defendant CLD responded with where they were located or he
would get the files for defendant JLD.  Id. at p. 86.

### b.    Testimony of Nahir Rodriguez

Rodriguez initially worked for Dr. Villamil,
defendant JLD's wife, from September 2009 until September 2011.
(Docket No. 394 at p. 34.)  Rodriguez served as a secretary at
Dr. Villamil's office on Monday to Thursdays from September 2009
until September 2011.  Id.  Starting in April 2010, she also began
to work for defendant CLD by performing data entry every Friday,
and she was paid fifty dollars for each day she performed data
entry.  Id. at pp. 40-43 & 68.  The information for the data entry

came from the patients that defendant CLD had attended to during
the week.  Id. at p. 44.  She performed the data entry at an office
in defendant CLD's home and stopped doing it some time between the
end of June and the beginning of July 2011.  Id. at pp. 42 & 73.

        She never worked directly for defendant JLD,
but she indicated that his biller, Leslie Williams, approached her
and asked her for help with billing because Rodriguez was a medical
secretary and had knowledge about billing practices.  Id. at
pp. 36-37, 66-67, & 76-77.  Rodriguez was told that defendant CLD
had a "trailer where he would give dental services to homes,
schools, and housing projects" and that the Department of State
required him to have a registered pediatrician and a general
practitioner.  Id. at pp. 71 & 79.  She was also told that the
general practitioner was defendant JLD, who "had to see [the
patients] first and give [defendant CLD] the okay for the patients
to receive services.  Id. at p. 71.  Rodriguez indicated that
Williams needed help with defendant JLD's billings and that
Rodriguez would help by filling out demographic information, such
as the name, surname, address, and the patient's medical plan
information on invoices.  Id.  In return, Rodriguez received one
dollar for each bill or invoice she prepared.  Id.  She did this
for defendant JLD from August 2010 until December 2010.  Id. at
p. 45.

Rodriguez indicated that either Williams or defendant JLD gave her the patients' information to use on the claims forms. Id. at p. 38. She received the patient files containing the necessary information at Dr. Villamil's office and filled out the forms at home. Id. She testified that she knew the files were coming from defendant CLD's office because she recognized them from her data entry. Id. at pp. 39-40 & 45-46. Furthermore, she indicated that defendant CLD's mobile clinic logo was located on the record. Id. at p. 40. Rodriguez also testified that she would often perform data entry for defendant CLD and then, one to two weeks later, she would use the information from those same patient files to fill out bills or invoices for defendant JLD. Id. at p. 50. Once she returned the bills to either defendant JLD or Williams, Rodriguez did not know what information was added to the bills. Id. at p. 67.

###        c.      **Testimony of Leslie Williams**

Williams was the manager of Dr. Villamil's pediatric office. (Docket No. 396 at p. 86.) She testified that she started working for Dr. Villamil in February 2005 and continued working there for almost seven years. Id. at pp. 87-88. During that time, she also worked as a biller for Dr. Villamil's husband, defendant JLD, for about eight or nine months. (Docket No. 392 at pp. 77 & 79; Docket No. 396 at p. 88.) She received one dollar per bill that she prepared for him. (Docket No. 396 at p. 88.)

Williams indicated that defendant JLD approached her in Dr. Villamil's office and said that he had a lot of billing work. Id. Defendant JLD told her that he "was the physician for the shop of his brother, [defendant CLD], had [sic] who happens to be a dentist." Id. at p. 89.

                In addition to working for Dr. Villamil and defendant JLD, she also worked as a biller for defendant CLD for about one and a half years. (Docket No. 392 at p. 96; Docket No. 396 at pp. 86 & 89.)  For defendant CLD, Williams entered billing information about the patients into an electronic system. (Docket No. 396 at p. 101.)  When she started working for him, she realized that all of the information that she used for defendant JLD's billing forms came from defendant CLD's dentistry files. (Docket No. 398 at p. 24; Docket No. 396 at pp. 101-102.)  While she worked for defendant CLD, she saw defendant JLD go into defendant CLD's home office to get records.  Id. at pp. 35-36.  She indicated that defendant JLD obtained permission from defendant CLD to go into the office.  Id. at p. 36.

                Williams indicated that defendants JLD and CLD had something that "they would call [a] log book", which contained information about patients to which defendant CLD had provided dental services.  (Docket No. 396 at pp. 92 & 94.)  The log book belonged to defendant CLD and it contained the location of service, the patients' names, their medical plan information, and whether

the dental services were covered.   Id. at pp. 92, 94 & 99.

Defendant JLD hired her to fill out billing forms manually – not

via computer or other electronic means – using the information from

the log book.   Id. at pp. 94-95.   On the claims forms, she would

complete the sections that required demographic information about

the patients:  the patients' name and address, medical plan, their

contract numbers, and their group numbers.   Id. at p. 97.

Defendant JLD gave her the necessary information to fill out the

forms and she started filling out the forms at defendant JLD's

home.  Id. at pp. 97-98.   Defendant JLD would then complete the

rest of the form but Williams did not know if defendant JLD would

sign instead of the patient.   Id. at p. 98.   She has never seen

defendant JLD treat a patient.   Id. at p. 103.

       Williams   testified   that   defendant   JLD

instructed her to write down "number 23, which means emergency

ward" for the place of service when she filled out the billing

forms.  Id.  Defendant JLD explained to her that the emergency ward

code is used for his billings because there was no billing code for

mobile clinics in Puerto Rico.   Id. at pp. 93-94.   None of the

medical procedures that Williams used to fill out the billing

forms, however, had any relationship to dentistry services.  Id. at

p. 104.

### d.   Testimony of Joel Figueroa-Robles

Joel Figueroa ("Figueroa") worked as a dental assistant for defendant CLD for two years, from 2009 to 2011. (Docket No. 396 at pp. 12-13.)   Figueroa worked in the mobile clinic, which he describes as "a pretty large trailer. . ." that contained dental chairs, x-rays, and "everything having to do with a dental office."   Id. at p. 14.   He stated that the mobile clinic was only equipped to address dental emergencies.   Id.   Another dental assistant and he worked in the mobile clinic; he was responsible for getting the patients "in [the] order as they would be attended."   Id. at p. 15.   For example, he would take the patients' vital signs and make sure that their records were ready. Id.   He stated that at the end of the day, defendant CLD checked to make sure that the files were complete and then took them away in his briefcase.   Id. at pp. 17-18.

Defendant CLD told Figueroa that defendant JLD was the general practitioner for the mobile clinic.   Id. at pp. 19 & 24.   During his period of employment with the mobile clinic, however, Figueroa took over 100 trips with the van, and he never sew defendant JLD working in the mobile clinic van or attend to any of the clinic's patients.   Id. at pp. 20, 21, 24, 25, & 27.   The only people who worked in the van were defendant CLD, Figueroa, and the other dental assistant, Mildred.   Id. at p. 20.

Figueroa testified that the dental assistants took the patients' vital signs and recorded them on a document to give to defendant CLD, who would then give the information to defendant JLD. Id. at pp. 19-20. Figueroa also stated that defendant CLD asked the dental assistants to fill out documents containing the vital signs, and defendant CLD said that he would give those to defendant JLD. Id. at pp. 21 & 24. The assistants received a payment of one dollar from defendant JLD for each vital sign information taken. Id. at p. 21. Most of time, defendant JLD paid Figueroa directly for the information about the vital signs, but if he was not available, then defendant CLD paid him. Id. at p. 23. Figueroa stated, however, that he never saw defendant CLD giving the information to defendant JLD, id. at p. 21, but Figueroa knew that defendant CLD gave the files to defendant JLD because defendant JLD would call defendant CLD to ask about the patients' files. Id. at pp. 29-30. Defendant CLD would then tell Mildred to give the files to defendant JLD. Id. at p. 30. Figueroa also observed defendant CLD receiving phone calls from defendant JLD about the locations where defendant CLD had provided services. Id. For example, Figueroa testified that defendant JLD had called and asked about the name of the school that the mobile clinic had visited the day before. Id. at pp. 30-31. Figueroa talked to defendant JLD directly when defendant CLD was busy and could not answer the phone. Id. at p. 31. Therefore, he helped defendant

CLD relay information to defendant JLD about the patients' files when defendant JLD called.  Id. at pp. 31-32.

### ii.   The Defendants' Arguments Regarding The Conspiracy Charge

Defendant JLD argues that the United States failed to prove:  (1) the amount paid to defendant JLD during the dates of the alleged conspiracy; (2) that defendant JLD billed Medicare and that the CMS received the claim forms; (3) any intentional and knowing act by defendant CLD, and that he acted in concert with his brother, defendant JLD.  (Docket No. 350 at p. 3.)

Defendant CLD argues that the government failed to show: (1) that defendant CLD knew what his brother, defendant JLD, was billing for on the claims forms related to his dental patients; (2) that defendant CLD knew how much defendant JLD was charging, how much defendant JLD had been paid, and where defendant JLD claimed to have provided his medical services; and (3) that defendant CLD received any payment as a result of what his brother was apparently doing.  (Docket No. 351 at p. 3.)  Instead, he contends that his conviction is based on "guilt by association." (Docket No. 351 at pp. 5-6; Docket No. 352 at p. 4.)

Defendant CLD also argues that the government failed to present any evidence of any intentional and knowing act by defendant CLD to show that he acted in concert with his brother, defendant JLD, to submit allegedly false claims for payments to any Medicare carrier.  Id. at p. 6.  He states that there is no

evidence that he participated in any way in the preparation of any such allegedly false claims forms; that he had knowledge about the means and manner in which the allegedly false claims forms were prepared; that he had any knowledge of the contents of any such alleged false claims forms; or that he aided and abetted[18] any such scheme to defraud.  Id.

While defendants JLD and CLD acknowledge that a formal agreement is not required to prove conspiracy, they suggest in their arguments that the government must prove all of the specific acts listed above to show that a conspiracy to commit health care fraud existed.  This is simply not the case.  As stated earlier, the government need only prove that (1) an agreement to commit health care fraud existed between the two defendants; (2) that both defendants willfully joined in the agreement; and that (3) one of the conspirators committed an overt act in an effort to further the purpose of the conspiracy.  The testimony of the defendants' employees, Perez, Rodriguez, Williams, and Figueroa confirm that defendants JLD and CLD worked "together understandingly, with a single design for the accomplishment of a

---

[18] The government did not charge defendant CLD with aiding and abetting in relation to the conspiracy charge of count one.  (See Docket No. 138 at p. 6.)  The government only charged defendant CLD with aiding and abetting in relation to the substantive health care fraud charges, in counts two through nine and ten through thirty, and the aggravated identity theft charges in counts thirty-one to thirty-five.  The Court will not address defendant CLD's argument regarding aiding and abetting in relation to the conspiracy charge because there cannot be aiding and abetting in a conspiracy charge.

common purpose." Newell, 658 F.3d at 14. Moreover, the First Circuit Court of Appeals has stated that "the government may prove an agreement by circumstantial evidence – say, for example, by showing 'a common purpose . . ., overlap of participants, and interdependence of various elements in the overall plan.'" Tum, 707 F.3d at 75.

The testimony supports the finding that the defendants had an agreement: defendant CLD supplied defendant JLD with the names and information of his patients, knowing that defendant JLD would submit claim forms even though he never attended to the patients in defendant CLD's mobile clinic. The evidence also supports a finding that both defendants were "willing participants." Id. at 74. Defendant JLD used the patient information with the help of defendant CLD: defendant CLD made arrangements to give his patients' information to defendant JLD for billing purposes and paid the assistants when defendant JLD was not able to do so, and defendant JLD submitted the billing claims. This same evidence can also lead a reasonable juror to determine that at least one, if not both, of the defendants, took overt acts to accomplish the purpose of the conspiracy. Thus, the government has provided sufficient evidence for a reasonable juror to find beyond a reasonable doubt that the defendants conspired to commit the federal crime of health care fraud.

Contrary to the defendants' contention that the government must prove that the defendants enriched themselves, (Docket No. 350 at p. 4; Docket No. 351 at p. 11, n. 4), there is no requirement that the government must prove that the defendants achieved the conspiracy or that it succeeded. Indeed, defendant JLD admits it in his motion by citing pattern jury instructions for the district courts of the First Circuit and stating: "The government does not have to prove the conspiracy succeeded or was achieved. The crime of conspiracy is complete upon the agreement to commit the underlying crime and the commission of one overt act." (Docket No. 350 at p. 16.) Here, the underlying crime is to commit health care fraud by submitting false and fraudulent claims to Medicare. Yet, defendant JLD quizzically argues in a cursory manner that the government has failed to present any evidence of payments. Id. at p. 4. His argument must fail.

Likewise, defendant CLD also cites to the same pattern jury instructions, (see Docket No. 351 at p. 11), but argues that "the government has made the success of the alleged conspiracy an element of the offense" because the government specifically alleged in the indictment that the object of the conspiracy was for the defendants to enrich themselves. Id. at p. 11, n. 4. This argument is entirely unconvincing. Defendant CLD cites no relevant authority for this contention and instead relies on an Eleventh Circuit Court of Appeals opinion, United

States v. Narog, 372 F.3d 1243 (11th Cir. 2004), without explaining how or why it applies to this case.  In Narog, the defendants were charged with possession of pseudoephedrine with the knowledge that it would be used to manufacture methamphetamine.  Narog, 372 F.3d at 1246.  The district court, however, instructed the jury that a conviction was warranted if defendants knew or reasonably believed that pseudoephedrine would be used to produce some controlled substance, which does not have to be methamphetamine.  Id. at 1247. This is inapposite to the issue at hand.  There is no jury instruction by the Court that constructively amends the conspiracy charge in the Indictment in this case.  Here, the crime charged in count one is conspiracy to commit health care fraud by unlawfully enriching themselves through false and fraudulent claims to Medicare.  (Docket No. 138 at pp. 6-7.)  As stated earlier, a conspiracy is complete upon the defendants' agreement to commit the underlying crime – to commit health care fraud by enriching themselves – and the commission of one overt act in furtherance of that purpose.  There is no need for the government to prove that the conspiracy was completed or that health care fraud or enrichment actually occurred.  Therefore, the Court finds both defendants' arguments unavailing and **DENIES** their motions pursuant to Rule 29 for the conspiracy charge.

With regard to the defendants' Rule 33 motions, their arguments are essentially the same as the ones set forth in

their Rule 29 motion – mainly that the weight of the evidence warrants a new trial.  (See Docket Nos. 350, 351, & 352.)  As defendant CLD admits in his Rule 33 motion, "[m]otions for new trials based on the weight of evidence are not favored, and courts are to grant them sparingly and with caution."  The Court's discussion of the sufficiency of evidence regarding the conspiracy charge is applicable to defendants' Rule 33 motions.  There is no indication that "the jury has reached a seriously erroneous result," Merlino, 592 F.3d at 32, given the consistent testimony from several witnesses and the supporting documentation introduced by the government.  Therefore, the Court declines to "intrude upon the jury function of credibility assessment," id. at 32-33, and **DENIES** both defendants' motions pursuant to Rule 33 for the conspiracy charge.

###    C.    Aggravated Identity Theft and Aiding and Abetting

Counts thirty-one to thirty-five of the Superseding Indictment charge both defendants JLD and CLD with aggravated identity theft pursuant to 18 U.S.C. § 1028A.[19]  In the same charges, both defendants are also charged with aiding and abetting

---

[19]   18 U.S.C. § 1028A provides in relevant part: (a) Offenses.–(1) In general. –Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

each other to commit aggravated identity theft pursuant to
18 U.S.C. § 2.[20]

### i.    Legal Framework for Aggravated Identity Theft

Pursuant to 18 U.S.C. § 1028A(a)(1), "a person is
guilty of aggravated identity theft if, in relation to any felony
listed in § 1028A(c),[21] he 'knowingly transfers, possesses, or uses,
without lawful authority a means of identification of another
person.'" United States v. Valerio, 676 F.3d 237, 244 (1st Cir.
2012) (citing 18 U.S.C. § 1028A).   The First Circuit Court of
Appeals has held repeatedly that the "knowing" requirement applies
"to two elements:  the 'means of identification' and 'of another
person.'" United States v. Tavares, 705 F.3d 4, 19 (1st Cir. 2013)
(internal citation omitted).  With regard to the knowledge element,
the First Circuit Court of Appeals has stated that "it is well-
established that knowledge may be proven by circumstantial evidence
alone; indeed, it frequently cannot be proven in any other way."
Valerio, 676 F.3d at 244 (internal citations and quotation marks
omitted) (discussing the knowledge element of 18 U.S.C. § 1028A).

---

[20] 18 U.S.C. § 2 provides that:  "(a) Whoever commits an
offense against the United States or aids, abets, counsels,
commands, induces or procures its commission, is punishable as a
principal.  (b) Whoever willfully causes an act to be done which if
directly performed by him or another would be an offense against
the United States, is punishable as a principal.  18 U.S.C. § 2.

[21] The list of felony violations in 18 U.S.C. Section 1028A(c)
includes health care fraud, 18 U.S.C. § 1347, and attempt and
conspiracy, 18 U.S.C. § 1349.

Furthermore, "regardless of how the means of identification is actually obtained, if its subsequent use breaks the law – specifically, during and in relation to the commission of a crime enumerated in subsection (c) – it is violative of § 1028A(a)(1). United States v. Ozuna-Cabrera, 663 F.3d 496, 498-99 (1st Cir. 2011).

### ii.  Legal Framework for Aiding and Abetting

        To establish aiding and abetting liability, the First Circuit Court of Appeals has stated that the government must prove that:  (1) "the principal committed the substantive offense charged" and (2) "the accomplice became associated with the principal's criminal endeavor and took part in it, intending to assure its success." United States v. Perez-Melendez, 599 F.3d 31, 40 (1st Cir. 2010) (citing United States v. Gonzalez, 570 F.3d 16, 28-29 (1st Cir. 2009) (internal quotation marks omitted)).  One way to establish that the defendant participated in the endeavor and intended to make it succeed is to "show[]that the defendant consciously shared the principal's knowledge of the underlying criminal act, and intended to help him." Id.  Simply showing that the accomplice merely associated with the principal or was merely present when the crime was committed, "even when combined with knowledge that a crime will be committed, is not sufficient to establish aiding and abetting liability." Id. at pp. 40-41 (internal citation and quotation marks omitted).

The government may also prove knowledge in the alternate theory of willful blindness. _Id._ at 41 (internal citations omitted). A jury is permitted to infer knowledge if it finds that the government has established, beyond a reasonable doubt, that a defendant (1) was aware of a high probability of the fact in question, and (2) that the defendant consciously and deliberately avoided learning of that fact. _Id._ (internal citations omitted). In other words, the jury may infer that defendant had knowledge of a fact that would have been obvious to him. _Id._ (internal citation omitted).

### iii. Defendants' Motions for Judgment of Acquittal

Defendants JLD and CLD argue that the government produced no evidence to support the aggravated identity theft charges. Furthermore, defendant CLD contends that there is no evidence to establish that he aided and abetted any aggravated identity theft. The Court finds defendants JLD and CLD's arguments unconvincing. First, the Court discusses the evidence presented regarding counts thirty-one to thirty-five of the Superseding Indictment. Then, the Court addresses defendant JLD's arguments. Finally, the Court addresses defendant CLD's arguments.

### a. Evidence Presented Regarding Counts Thirty-One to Thirty-Five

Rosana Martinez ("Martinez") testified on behalf of the government. Martinez is a nurse by profession and has been the director of the _Hogar Huerto de Jesus_, a home for

mental health patients in Trujillo Alto, for the past seven years. (Docket No. 391 at pp. 26-27.)  She is also a co-owner of the home and generally is the person in charge of visitors to the home or outside services provided to patients at the home.  Id.  She indicated that defendant CLD provided dental services via his mobile dental clinic to all of her residents in 2009.  Id. at pp. 28 & 49.  When he provided his dental services, defendant CLD usually came to the home with two or three assistants, but no other doctor or physician was present at the mobile dental clinic.  Id. at p. 31.  She indicated that Heidelbert Blasco-Sardinia is the physician that regularly provides services to patients in her home. Id. at p. 39.  She does not know any doctor by the name of Jose Lopez-Diaz.  Id. at p. 40.

Martinez also provided testimony about the beneficiaries listed in counts thirty-one to thirty-five.  She stated that she provided a list of the residents to defendant CLD so that he could bill for his services.  (Docket No. 391 at pp. 35-37 & 86; Exh. 20.)  The list contains the names of the beneficiaries indicated in counts thirty-one to thirty-five: Richard Burgos-Montanez ("Burgos"), listed as "R.B.M." in count thirty-one; Carlos Balbin-Feliciano ("Balbin"), listed as "C.B.F." in count thirty-two; Thomas Alvarado-del Valle ("Alvarado"), listed as "T.A.D.V." in count thirty-three; Gilberto Sanchez-Berrios ("Sanchez"), listed as "G.S.B." in count thirty-four; and Francisco

Molina-Lopez ("Molina"), listed as "F.M.L." in count thirty-five. (See Docket No. 138 at p. 17; Exh. 20.)  Martinez stated that she signed release forms for these particular patients so that defendant CLD would be able to render dental services to them. (Docket No. 391 at pp. 73-74.)  She testified, however, that she did not know any physician who worked "as a consultant" to the dental clinic.  Id. at p. 67.  If she had known that the release forms authorized that, she would have refused to sign them because her patients are only seen by Heidelbert Blasco.  Id.  She also stated that she has never authorized defendant CLD to provide any of the residents' information to defendant JLD.  Id. at p. 86.

With regard to the alleged services provided by defendant JLD, Martinez stated that Balbin, who is listed in count thirty-two, and Alvarado, who is listed in count thirty-three, did not dislocate their shoulders on January 23, 2010.  (Docket No. 391 at pp. 90-91.)  Yet, defendant JLD submitted two claim forms to Medical Card System ("MCS"), a MAP, indicating that defendant JLD provided surgery in the form of "treatment of shoulder dislocation with manipulation without anesthesia," a surgical procedure using CPT Code 23650, (Docket No. 405 at p. 21), on that date to Balbin and Alvarado.  (See Exh. 15.)  Martinez also stated that Molina never suffered any type of injury "in between his legs" that required a visit to the hospital on January 28, 2010.  (Docket No. 391 at pp. 43-44 & 89.)  As indicated in count thirty-five of the

indictment, a claim for a perineal urinary extravasation procedure pursuant to CPT Code 53085 on January 28, 2010, however, was submitted to MCS and lists defendant JLD as the provider of these services to Molina. (Docket No. 138 at p. 17; Docket No. 391 at p. 89; Exh. 15.) Martinez confirmed that the signature on the claims form did not belong to Molina or to her.[22] (Docket No. 391 at p. 45.) Furthermore, the patient files of Burgos and Sanchez from defendant CLD's clinic indicate that Burgos and Sanchez did not receive any services from defendant CLD or JLD in January 2010 even though at least two claims forms were submitted to MCS for services on those dates. (Exh. D3, D6, & 15.) One claim form indicates that on January 20, 2010, Burgos received treatment for a shoulder dislocation pursuant to CPT code 23650, (Docket No. 405 at p. 21), and treatment during an emergency department visit pursuant to CPT code 99285, id. at p. 23, from defendant JLD. (Exh. 15.) Another claim form indicates that Sanchez received treatment for drainage of perineal urinary extravasation pursuant to CPT code 53085, (Docket No. 405 at p. 22), and also received an emergency department visit pursuant to CPT code 99285, id. at p. 23, on January 24, 2010 from defendant JLD. (Exh. 15.)

---

[22] Usually, in cases where medical assistance is required for any of the home's residents, Martinez is the one who signs on behalf of the mental health patients in her home. (Docket No. 391 at p. 40.) She usually signs her own name and then writes the patient's name beside her signature. Id.

**b.    Defendant JLD's Arguments Regarding Aggravated Identity Theft**

With regard to the aggravated identity theft charged in counts thirty-one to thirty-five, defendant JLD argues that the government failed to produce any evidence of the alleged fraud or that defendant JLD stole the beneficiaries' identities. (Docket No. 350 at p. 9.)    He also argues that because the aggravated identity theft charges are an enhancement of a fraud conviction, defendant JLD must be convicted of health care fraud of the persons mentioned in counts thirty-one to thirty-five. (Docket No. 350 at pp. 9-10.)    He contends that the government failed to present any evidence to establish when, where, and under what circumstances the identities were stolen and that a fraud was committed.    Id.    Finally, he argues that the Government failed to prove that defendant JLD knew that the identifications used belonged to a real person.    Id. at p. 10.

The Court finds that there is sufficient evidence for a jury to find that defendant JLD is guilty of aggravated identity theft.    Taken together, Martinez's testimony, the claims forms for the five beneficiaries listed in counts thirty-one to thirty-five, and the patient files from defendant CLD's clinic are sufficient for a jury to find that defendant JLD knowingly used the beneficiaries' MCS member I.Ds., names, and dates of birth for an unlawful purpose:  to collect money from Medicare for medical services that were not rendered.    Martinez's

testimony indicates that she and her patients did not authorize defendant CLD to give defendant JLD access to the patients' information and that none of the services listed on the claim forms occurred. Contrary to defendant JLD's argument that the government must produce evidence that defendant JLD stole the beneficiaries' identities and that the government must establish when, where, and what circumstances the identities were stolen, (Docket No. 350 at p. 9), nowhere is this requirement found in 18 U.S.C. § 1028A or any other authority. As stated earlier, the First Circuit Court of Appeals has held that "regardless of how the means of identification is actually obtained, if its subsequent use breaks the law–specifically, during and in relation to the commission of a crime enumerated in subsection (c)–it is violative of § 1028A(a)(1)." Ozuna-Cabrera, 663 F.3d at 498-99.

Next, defendant JLD argues that because the aggravated identity theft charges are an enhancement of a fraud conviction, defendant JLD must be convicted of health care fraud of the persons mentioned in counts thirty-one to thirty-five in order to be found guilty of aggravated identity theft. (Docket No. 350 at pp. 9-10.) Again, nowhere is this requirement found in the statutory language or other relevant authority. In fact, 18 U.S.C. § 1028A is clear that this strict interpretation is not required; the statute states and reiterates that the means of identification must be knowingly transferred, possessed, or used, without lawful

authority, "*during and in relation* to any felony violation
enumerated . . . " 18 U.S.C. § 1028A(a)(1) and (a)(2). Thus,
while committing the applicable offenses, which are health care
fraud pursuant to 18 U.S.C. § 1347 and conspiracy to commit health
care fraud pursuant to 18 U.S.C. § 1349, defendant JLD must have
used a person's means of identification unlawfully. It is enough
for defendant JLD to have used the means of identification in
furtherance of his health care fraud scheme, and the government has
presented sufficient evidence for a reasonable juror to infer that
he did so in this case. See Savarese, 686 F.3d at 8(stating that
it is "plainly inferable from the evidence" that defendant
"possessed and transferred [a person's] means of identification .
. . in furtherance of the scheme" and that this is enough to meet
the requirements of 18 U.S.C. § 1028A(a)(1)).

Finally, defendant JLD argues that the
Government failed to prove that defendant JLD knew that the
identifications used belonged to a real person. (Docket No. 350 at
p. 10.) The First Circuit Court of Appeals has stated that "it
matters not whether [the defendant] can raise a plausible theory of
innocence: if the record as a whole justifies a judgment of
conviction, [the Court] need not rule out other hypotheses more
congenial to a finding of innocence." Valerio, 676 F.3d at 245
(internal quotations marks and citations omitted). It is plausible
for the jury to have found that defendant JLD knew that the five

names in counts thirty-one to thirty-five are real people given
that there is testimony establishing how defendants JLD and CLD
discussed defendant CLD's patients.  Furthermore, the evidence
shows that defendant JLD used the information to submit bills
indicating that he provided services to the beneficiaries, which
can lead a reasonable juror to believe that he knew the information
used belonged to real people.  Therefore, it is a plausible
inference that defendant JLD possessed knowledge that the
information he used in the billing claims belonged to real people.
See Valerio, 676 F.3d at 246 (reviewing a jury verdict for
sufficiency of evidence in an aggravated identity theft claim and
holding that, "[t]he jury was entitled to choose [the plausible
inference that defendant had knowledge that the information she
used belonged to a real person] and it is not this Court's place to
question the jury's choice.")

          The Court also denies defendant JLD's Rule 33
motion regarding the aggravated identity theft charges.  Similar to
the Court's health care fraud findings, Defendant JLD has not
indicated that there is any new evidence that warrants review by
the Court,(see Docket No. 350), and there is no "miscarriage of
justice" here.  Garcia-Alvarez, 541 F.3d at 16-17.  Defendant JLD
does not allege that the credibility of witnesses is at question
and the Court finds no problem with this issue either.  Thus, the
Court declines to "intrude upon the jury function of credibility

assessment." <u>Merlino</u>, 592 F.3d at 32-33.  Finally, the extensive evidence presented at trial does not preponderate heavily against the verdict.  <u>Rodriguez-De Jesus</u>, 202 F.3d at 486 (quoting <u>Gonzalez-Gonzalez</u>, 136 F.3d at 12 (stating that the remedy of a new trial is used rarely and "only where there would be a miscarriage of justice or where the evidence preponderates heavily against the verdict").  Therefore, the Court also **DENIES** defendant JLD's Rule 33 motion regarding the aggravated identity theft charges.

### c.  Defendant CLD's Arguments Regarding Aggravated Identity Theft

Defendant CLD argues that he cannot be convicted of identity theft because he was not found guilty for health care fraud in violation of 18 U.S.C. § 1347.  (Docket No. 351 at p. 16.)  He also argues that there is no evidence that he knowingly and/or intentionally engaged in any type of identity theft or aggravated identity theft; that he aided and abetted in any such crimes; or that he enriched himself[23] as a result of the alleged false claims.  (Docket No. 352 at p. 5.)

First, defendant CLD argues that he cannot be convicted of identity theft because he was not found guilty for health care fraud in violation of 18 U.S.C. § 1347.  (Docket

---

[23] The Court declines to address this argument because the statutory language and applicable case law does not require the government to show that a defendant "enriched himself as a result of the alleged false claims" to establish an aggravated identity theft charge.  <u>See</u> 18 U.S.C. § 1028A; <u>Valerio</u>, 676 F.3d at 244.

No. 351 at p. 16.)  While defendant CLD was not convicted of health

care fraud in violation of 18 U.S.C. § 1347, he was convicted of

conspiracy to commit health care fraud, 18 U.S.C. § 1349, which is

also an enumerated offense set forth in 18 U.S.C. § 1028A(c)(5).

18 U.S.C. § 1028A(c) ("For purposes of this section, the term

'felony violation enumerated in subsection (c)' means *any* offense

that is a felony violation of–(5) *any* provision contained in

chapter 63 (relating to mail, bank, and wire fraud) . . .").  Cf.

United States v. Abdur-Rahman, 708 F.3d 98, 102 (2d Cir. 2013)

(affirming the district court's holding that 18 U.S.C.

§ 1028A(c)(5) includes any fraud criminalized in Chapter 63).

Because the statutory language of 18 U.S.C. § 1028A(c)(5) provides

a penalty enhancement for a conspiracy charge pursuant to 18 U.S.C.

§ 1349, the Court disagrees with defendant CLD's argument that he

cannot be convicted of aggravated identity theft.

Defendant CLD argues, however, that the

Superseding Indictment only charges defendants with aggravated

identity theft in relation to health care fraud pursuant to 18

U.S.C. § 1347 and not conspiracy pursuant to 18 U.S.C. § 1349.

(Docket No. 351 at p. 23; Docket No. 380 at p. 10.)  Furthermore,

he argues that the jury instructions regarding aggravated identity

theft state that the defendant must have committed "the crime of

health care fraud" and do not list conspiracy to commit health care

fraud.  Id.  Defendant CLD also argues that a typographical error

caused the jury to rely on language that is not related to health care fraud but instead relates to actions of co-conspirators. (Docket No. 351 at pp. 24-25.) Defendant CLD admits, however, that he did not make any objection to this typographical error at trial. Id. at p. 25.

Defendant CLD also fails to acknowledge that in the Superseding Indictment the government expressly included an alternate theory of liability against defendants for aiding and abetting to commit aggravated identity theft pursuant to 18 U.S.C. § 2, which states that an aider and abetter is "punishable as a principal." (See Docket No. 138 at p. 17; 18 U.S.C. § 2.) As discussed earlier, a defendant need not perform the underlying crime or crimes to be guilty of aiding and abetting, as long as the government can establish that he participated in the endeavor and sought to make it succeed. The instructions to the jury on this matter stated as much, (see Docket No. 307 at p. 25), and defendant CLD makes no objection to them in his motions, (see Docket Nos. 351-352.) Defendant CLD conveniently ignores this alternate theory of liability in the Superseding Indictment and in the jury instructions. Because the government expressly charged defendants with aiding and abetting each other to commit aggravated identity theft, defendant CLD may be found guilty of aggravated identity theft on this alternate theory of liability also. Thus, the Court finds that there is sufficient evidence to find defendant CLD

guilty of aiding and abetting defendant JLD to commit aggravated identity theft, and therefore, to find him punishable as a principal.

The government did not show that defendant CLD "merely associated" with defendant JLD. As mentioned earlier, the government presented evidence about how defendant CLD participated in the endeavor by willingly handing over his files with all of the patients' information to defendant JLD to bill, even though defendant JLD never attended to any of his patients. Testimony revealed that defendant CLD gave the files to the assistants for them to in turn give them to defendant JLD. Or, defendant CLD asked one of the assistants to pull the files for him. Defendant CLD even paid his employees for filling out billing forms when defendant JLD was unable to pay them. Alternatively, as the government argues, (Docket No. 361 at pp. 52-53), the jury is entitled to find that defendant CLD was willfully blind to defendant JLD's behavior. Given that defendant CLD knew that defendant JLD never attended to the mobile clinic patients, a reasonable juror could find that there was a high probability that defendant JLD used the patient information to bill for services that did not occur. A reasonable juror could also find that, based on the evidence presented, defendant CLD deliberately avoided learning about what exactly defendant JLD billed for in his claims, given that defendant CLD is also a medical provider, submits

billing claims himself, and understands what is required of a
medical provider in order to submit claims.  Therefore, the Court
**DENIES** defendant CLD's Rule 29 motion regarding the aggravated
identity theft charges.

        The Court also **DENIES** defendant CLD's Rule 33
motion regarding the aggravated identity theft charges.  Similar to
defendant JLD, defendant CLD has not indicated that there is any
new evidence that warrants review by the Court.  (See Docket
No. 352.)  Again, there is no miscarriage of justice here.  Garcia-
Alvarez, 541 F.3d at 16-17.  Defendant CLD does not allege that the
credibility of witnesses is at issue; indeed, the Court finds no
problem with the credibility of witnesses and declines to "intrude
upon the jury function of credibility assessment."  Merlino, 592
F.3d at 32-33.  Finally, the evidence by the government does not
preponderate heavily against the verdict.  Rodriguez-de Jesus, 202
F.3d at 486 (quoting Gonzalez-Gonzalez, 136 F.3d at 12 (stating
that the remedy of a new trial is used rarely and "only where there
would be a miscarriage of justice or where the evidence
preponderates heavily against the verdict").  Therefore, the Court
also **DENIES** defendant CLD's Rule 33 motion regarding the aggravated
identity theft charges.

        D.    **Federal Rule of Evidence 404(b)**

        Defendant JLD also argues cursorily that the evidence
presented by the government regarding defendant JLD's treatment of

his family members is impermissible pursuant to Federal Rule of Evidence 404(b) ("Rule 404(b)"). Rule 404(b) prohibits the admission of prior bad acts to establish an individual's character or propensity to commit a crime. The rule permits, however, the admission of prior bad acts "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." United States v. Landry, 631 F.3d 597, 602 (1st Cir. 2011) (citing Fed.R.Evid. 404(b)). Additionally, prior bad acts may be admitted in conspiracy cases under 404(b) if they "explain the background, formation and development of the illegal relationship." United States v. Varoudakis, 233 F.3d 113, 118 (1st Cir. 2000) (internal citations omitted). The Court has already addressed these arguments extensively in an earlier order, (see Docket No. 268), and at trial, (see Docket No. 396 at pp. 108-120). Similar to its earlier reasoning, the Court finds no support for defendant JLD's contention that this evidence was used to establish that "the defendant was a bad person in charging for treating his family." (Docket No. 350 at p. 24.) Instead, the Court found, (see id.), and still finds, that the government introduced the evidence to show that defendant JLD billed for treatment on his family members that did not occur. Thus, the evidence may be introduced as to defendant JLD pursuant to Rule 404(b) because it is relevant to a common scheme or plan and the absence of mistake to defraud a

health care benefit program.  The Court **DENIES** defendant JLD's Rule

29 and 33 motions on this ground.

   **E.   Exhibit List**

       Finally, defendant JLD argues, as he and defendant CLD's

counsel argued during trial, (see e.g., Docket No. 406 at pp. 6-

12), that the government failed to present an exhibit list and that

the trial was "a trial by ambush," (Docket No. 350 at p. 24).  The

Court finds defendant JLD's arguments unconvincing.  As presented

at trial and in the government's response to the defendants'

Rule 29 and 33 motions, the government provided a total of seven

discovery packages to the defendants between September 2011 and

March 2012.  On March 26, 2012, nearly two months before the trial

began, the government filed a motion submitting Designation of

Evidence, which listed all of the evidence that the government

intended to use during trial.  (See Docket No. 206.)  Both

defendants had ample opportunity and time to review the documents

but did not seem to do so.  At several times during the trial, the

defendants' attorneys argued that they did not receive certain

documents and the government promptly identified the exact

discovery packages that contained the documents.  (See e.g., Docket

No. 401 at p. 127; Docket No. 391 at pp. 33-34.)  Therefore, the

Court **DENIES** defendant JLD's motions for a judgment of acquittal

and for a new trial on this basis.

## III. CONCLUSION

Having considered the evidence in the light most favorable to the government, and having made all reasonable inferences in its favor, United States v. Giamro, 544 F.3d 26, 29 (1st Cir. 2008), the Court concludes that the government presented sufficient evidence to support both defendants' convictions. Accordingly, the Court **DENIES** both defendants' motions for acquittal pursuant to Rule 29 and **SUSTAINS** the jury verdict.

Given that motions for a new trial based on the weight of evidence should only be granted when it is "clear that the jury has reached a seriously erroneous result," Merlino, 592 F.3d at 32, the Court also **DENIES** both defendants' motions for a new trial pursuant to Rule 33.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, April 22, 2013.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
United States District Judge
